The first case on the call this morning is the People's State of Illinois v. Teodora Baez. Case number 98911. Good morning, Your Honors. May it please the Court, Kim Fawcett for Teodora Baez. This case was indicted in February of 2000 as a double homicide, and Mr. Baez was appointed to the Public Defender Office to represent him. He had some difficulty with the Public Defender Office, moved for substitution to private counsel. That was denied, but Mr. Baez's girlfriend hired Jeffrey Granich, retained Jeffrey Granich in the summer of 2000. And we know from the record that the retainer agreement was about $6,500. The following April, the State announced its intent to seek the death penalty, and Mr. Granich was prepared for that, and he had a motion to appoint counsel under the Capital Crimes Litigation Act. That statute was in effect starting January 1st, 2000. On April 2nd, the motion was tendered to the State. The judge gave the State three weeks to look at the motion, told Mr. Baez he needed to add another affidavit. They came back on April 26th. On April 26th, the judge appointed Mr. Granich as counsel under the Capital Crimes Litigation Act. Now, did Mr. Granich deceive the court in this motion? Was the court right when the court recently said, he sprung on me that there were two lawyers now he's asking for after I appointed him? He didn't tell me that he was going out of the country for an extended vacation? Was Mr. Granich a deceiver? Well, first of all, Mr. Granich would have expected that the court had read the motion. It was a written motion. Mr. Granich didn't know that the motion was misplaced. How would he know that? The judge didn't say, Mr. Granich, I don't have your motion. I haven't read your motion. Can you tell me what's in it? Or let's defer this to the next date. It was reasonable for Mr. Granich to assume the judge had read the motion, and in the motion he said, I want to have an appointment for myself and my trial partner, John Tice, who was known to the court. In fact, Mr. Granich and Mr. Tice had tried a first-degree murder case before the court about a year before. It wasn't a capital case, but they were both known to the court. At this point, is this case ready to go ahead, or would a delay in the trial be a realistic worry? Your Honor, I think from an objective standpoint, there was no possibility that there was going to be a long delay in the case caused by Mr. Granich. Because, one, the most important reason was the case ready to go ahead at that point. I'm sorry? Was the case ready to go ahead at that point? It was not. Any more discovery to be done? No. The only discovery that was completed, and I think it was 98% completed, was guilt-innocence. There was no discovery on mitigation at all, because the mitigation investigation had not been even started. The aggravation discovery in the investigation was in progress, but the investigation wasn't done, let alone the discovery. The case was a long, long way from going to trial or resolution or a sentencing hearing. Mr. Fawcett, I note that as far as the facts go, as to exactly even what was said or whatnot, I mean, the facts are in dispute as portrayed by both the State and yourself here today. Would you agree, though, that Mr. Granich's answers to questions were somewhat equivocal or not? At the hearing? Yes. I think he answered the questions pretty straightforwardly, but he was unable to say more than Mr. Tice and I would share responsibility for the case. He said he was thinking about living in Israel. He was not asked, were you going to not return on this trip? All of his testimony is he was going to return on this trip. So I think his answers were pretty straightforward to the extent he could give them. Does the fact that the retainer was $6,000 raise questions about how genuine that retainer was? Well, you know, I think that it was a genuine retainer, but I think Mr. Granich is expected to get more money eventually, but that problem was resolved when the court appointed Mr. Granich under the Capital Crimes Litigation Act because the trust fund was there to provide funding. So from Mr. Granich's standpoint, he thought that the motion made clear that he was asking for two lawyers and they would get funding and then that would be the end of the problem. It's true he took the case for short money, no doubt about it, but there's nothing inherently wrong about that at that time in the summer of 2000, and I'm aware of the court's special committee report from October 28th, 2000, which reports on the subject matter of lawyers who are not Rule 714 bar counsel taking cases that are potentially capital cases. That report had not come out at that time. Based on these facts, could a case be made that a judge would have abused his discretion for allowing an attorney to continue on knowing what he knew in this case? No, I don't think it would have been an abuse of discretion to have left Mr. Granich in the case. It might have been an abuse of discretion not to appoint Attorney Tice, but it would not have been an abuse of discretion to leave Mr. Granich in the case. He was qualified to be lead counsel under Rule 714 if that rule applied in this case, which it does not because of the date of the indictment. But he testified at the hearing that he had five full murder jury trials and eight full felony trials by 2000, 2001. The fact that he has never applied to be Rule 714 counsel is really irrelevant in this case for the purposes of the judge's decision at the time. It may be important for this Court to say that in the future, counsel should not take a potential capital case unless they are members of Rule 714 bar. That's understood. But at the time that Mr. Granich took the case, it was perfectly normal. In fact, that was the understanding in the 1999 report in the special committee from this Court that counsel could take these potential capital cases and then get a fast track into Rule 714. It was only the October 28th report that changed that and said, no, we don't want to do that because we don't want to appoint non-Rule 714 counsel in a capital case even at the beginning of the case. But Granich was an experienced lawyer. Counsel, could you clear up for me? Was there a clear appointment of Granich under the capital litigation trial bar or capital litigation fund? Yes. And then this other motion that came later for the appointment of a second attorney? No, no, Your Honor. A separate? No, Granich filed his appearance on August 31st. The following April 2nd, he submitted his written motion, which was titled Motion to Appoint Counsel under the Capital Crimes Litigation Act. In the body of the motion, he said, appoint me and appoint my trial partner, John Tice. And is that when it came up about Mr. Granich going on an extended vacation? Yes. He said, after the judge said, oh, I don't know what to do. I'll just appoint you. He said, well, my motion also. He said, I don't know what to do other than say you were appointed. And Mr. Granich said, well, Judge, my motion also talks about appointing Attorney Tice. And the reason I wanted to appoint Attorney Tice is I'm going on vacation, and Attorney Tice will take over the case until I return. That's on page 57 of the first report of proceedings. And at some point, the judge wanted an affidavit or writing from him. Was that provided? No. Why not? Well, he said he didn't remember why he didn't provide that. He said the trip was very unplanned. So what happened was the judge said, okay, well, I understand you want two-bar counsel, but I don't know if I can do that under the Act, so I'll appoint you now, and you can come back and present that issue. So the next date was May 9, and they presented the issue. I think there was a conference in Chambers on May 9 when Granich told the judge he was going out of the country. And the reason I say that is the judge three times in the findings said he said he was going out of the country, and he said it early in the case. I have page 24 and 28, actually 17, 19, and 24. The judge says three times he told me he was going out of the country, and this is on May 9. But she said then you need to put it in writing when you'll be gone. And I want it by May 16 is what she ultimately said in the remand hearing. He did not do that. He continually said I don't know how long I'm going to be gone. I'm going to be gone for months. Is it unreasonable for the court to be concerned about counsel in a death penalty case, particularly when counsel says I'm going to be gone but I don't know how long? I mean, isn't the defendant entitled to an attorney that's there to represent him? Well, it would have been a much bigger problem had he been the only counsel in the case. But he believed that he was entitled under the law to have two counsel appointed. And if the second counsel came in and was not up to speed, as Mr. Tice was not, he would have to read all the guilt and innocence discovery, and he would have to manage the mitigation expert who had not yet been hired, who would have been paid out of the fund. And Mr. Granich's decision to go on the fax of this case was in sync with the window of opportunity provided by the long course of time it would take to do a mitigation investigation. So he testified, he thought, six to 18 months. It took two years to do the mitigation investigation. It was summer of 2001 to summer of 2003. So on the fax of this case, it was not unreasonable. Yeah, I think a judge should be concerned, but I don't think Mr. Granich deceived the judge because the only time he would have been required to make a statement of what his vacation plans were from the beginning was if he needed to file a motion for continuance. He did not need to file a motion for continuance in this case because there was no upcoming date that needed to be continued. There was only ongoing exchange of discovery. Now, what happened was the judge didn't read the motion. She didn't know that he was asking for two lawyers. So he had to say, well, wait a minute, Judge, I'm asking for two lawyers. I'm asking for Mr. Tice, too. And I don't think the judge was very happy about that. I think the judge is at fault for not having read the motion. The judge could have said, I don't have the motion. What does it say? But the judge did not. The judge is busy. I understand that. The judge wanted to resolve this matter quickly. I understand that. But, counsel, I mean, we're looking at a very short time. Granich was appointed in April, and then the judge vacated that order the following month. So does that fact that Granich was appointed only for a brief period of time have any effect on our determination of whether it was error to remove Granich from representing the defendant? I mean, it's only a short period. Your Honor, I understand that. It was a month between the time he was appointed and the time that he was removed and the public defender was appointed. But he had been in the case for the last eight months, and really nine months by the time he was removed. He testified he had an excellent attorney-client relationship with Mr. Baez. Mr. Baez had complained about the public defender, but he said nothing about Mr. Baez, about Mr. Granich. There were no complaints about Mr. Granich. Mr. Granich was in the case, had a good relationship with Mr. Baez, and was preparing the case. He had investigated insanity defense. That was what the referrals were, the BCX referrals were, in the spring of 2001. The case was simply not able to go forward until they had a mitigation investigation conducted. If the state is asking, giving an announcement of we're seeking death, then it's the time for the defense lawyer to say, well, I need funding under the Capital Crimes Litigation Act. So the fact that he's in the case as appointed counsel for a month should not make a difference here because he was really just like a retained counsel up until the time that the state asked for a death penalty. Mr. Fawcett, is there any consequence to the fact that at one time Mr. Granich indicated he would come back and try the case, and then at a later point in time indicated he really meant he would come back and litigate motions earlier? Especially in light of the fact that he did say his plan was to move away for good at one point, right? Well, I think he said he was thinking about living in Israel, but he didn't say this trip. Now, the judge may have misremembered that, but, gee, Mr. Granich is on the witness stand. The judge is right there. I don't know why the judge didn't ask him that question. He was the court's witness. We made him the court's witness so we could cross-examine on both sides. The judge never asked him, didn't you tell me that you were going to go away and not come back? You shouldn't ask him that question. But the judge did not find him credible when the second time he indicated that he would have come back and litigated some motions, when earlier he said he'd come back to try the case. Yeah, the judge was focusing on that difference in language. He said, when I said I'd come back and try the case, I meant I'd come back and litigate the motions. But we don't know that there was any motions to be litigated. We don't know. There was a motion to quash the statement that was filed in September 2002. But we don't know that Mr. Granich and Mr. Tice would have elected to do that. Is it your position that it doesn't matter which answer is correct, whether he was coming back just to try the case or litigate the motions? Because we have to give some deference to a credibility determination of the judge, right? Well, I think it makes very little difference because of this. Granich was the only lawyer in the case for the defense the whole time. And if the judge had appointed him and not Tice and left him in, he would have been the only lawyer in the case. The judge was not concerned about having two lawyers for motions in that situation. You're going to bring the motions to the press and Granich is going to do it by himself. Where is the concern about having two lawyers then? It's only when he says he's going on an extended vacation that the judge is uncomfortable about that. The judge has a policy preference in her own mind that she wants a public defender. Well, now we're worried about, well, I can't have one lawyer, Mr. Tice, do the motions while you're in Israel. I have to have two lawyers. Where does that come from? That's a real inconsistency. And I think harping on the difference between I'm going to come back and litigate or I'm going to come back and try, you know, that's a fine cutting a hair, really. That's a very fine cut. So I don't think it makes that much difference. He always said on the record, I'm going to return on page 57 and page 63, I'm going to return and try the case. He always testified at the hearing that he and Mr. Tice were going to work the case together. Beyond that, he said we didn't really know how we were going to divide up things because it was pretty early. So I'm saying it's an abuse of discretion for the judge to have removed Mr. Granich because it just wasn't necessary. The judge could have set a long date, an October date, come back in October, you better be here, Mr. Granich, and we'll have a conference and see where you are on your mitigation investigation, and we'll see what motions are going to be filed and when. And the judge could have done that, but the judge did not consider that alternative. The judge could have said you cut your vacation in half or you can have 90 days. The judge didn't do that. The judge simply made the most expedient decision on the day the case was in front of her, and that created a problem because now he is appointed counsel, and the rule is not that Mr. Baez is exercising some right that he is not entitled to. He's not choosing his own lawyer. This is an existing attorney-client relationship. Throughout this case, the judge has said since he took the case for short money, he's not really retained. Therefore, he's not in the case. Therefore, Baez is just like somebody who's asking for the first time to be appointed a lawyer, and I want F. Lee Bailey or whomever your choice is. But that's not true. That's not what Mr. Baez's situation was. He had a counsel for nine months who was his counsel. They had an excellent relationship, and the controlling case law from the appellate court first district was that the judge had to consult Mr. Baez. Now, these are conflict of interest cases, or no, these are ineffective assistance of counsel cases. Davis and Jackson in the court, the appellate court said, well, you can't take the appointed lawyer out of a case without consulting with the defendant because maybe the defendant will waive the ineffectiveness. But those cases are based on that California Supreme Court case, Smith v. Superior Court, which says you cannot remove appointed counsel over the objection of appointed counsel and the client. Mr. Baez never consented to any of this. He wasn't even asked. The judge had a preference for the public defender because that's what she was used to, and the first instinct was on May 9th, the very first day that she knew that Mr. Granish was going to go on an extended vacation to Israel, out of the country, he may have said extended vacation previously, but it was May 9th, I think, is when he said he was going out of the country. She said, well, we're going to have substitution of counsel in this case rather than two counsels, and that was the instinct. That was the instinctive answer the judge went with, and she never changed from that position. This is a violation of Mr. Baez's Sixth Amendment right to counsel, and it ought to be an open question under Gonzales-Lopez whether it's a violation of counsel of right because the U.S. Supreme Court has not decided a case where counsel has been retained first and then appointed in a capital case. But even if we don't have the counsel of right issue, we have Davis and Jackson, and Burnett is consistent with Davis and Jackson. I don't think it cites them saying that the judge is not supposed to remove appointed counsel at will, the judge is not supposed to remove appointed counsel without a good reason, and it just wasn't a good enough reason in this case. Mr. Granish went to Israel for four months, June to the beginning of October, maybe middle of October, I'm not sure. He said four months, and he came back. The mitigation report took two years. The pre-trial motion that was ultimately filed was filed in September of 2002. It's an unfortunate fact that the amount of paper in these cases takes a long time for the lawyers to read and digest, and Mr. Granish had a window of opportunity to take a vacation, which he did a lot apparently, but he had other lawyers handling the case. And I think the judge abused discretion by not even asking Attorney Granish how he managed his practice when he was gone. Just to clarify a question in my mind, you're not arguing now counsel of choice. You're not arguing that Granish is a retained attorney, but he was an appointed attorney, and the trial court didn't have the authority to remove an appointed attorney. I want to hold on to that point. I think it's an open question under Gonzales-Lopez that even though he was appointed, he started out as retained. In other words, all the values that exist in a retained case are present in this case, but the sole difference is that he was appointed for purposes of a death penalty hearing, and I want to retain the argument that Gonzales-Lopez would apply to that, although I acknowledge it's an open question. I've cited a case in the brief from Alabama that addresses that problem and applies the right to counsel of choice. Let me start with the premise that if it were appointed counsel from the beginning, the defendant wouldn't have a choice of an appointed counsel. Yes. But because he's retained, or does he have a choice? No, I agree. I agree 100 percent. The general rule is if you go to court and you don't have a lawyer and say, I can't afford a lawyer, please appoint me a lawyer, you don't get to choose Ethley Bailey or me or anybody. Are you arguing because he was initially retained, the court had to appoint him, or are you just arguing because the court did appoint him, the court could not change him? I'm arguing that because the court did appoint him. The court was not required to appoint him at that instance. In fact, the court could have said, Mr. Granish, in for a dime, in for a dollar. Sorry, I'm not appointing you. You can do the case or you can move to withdraw. But, you know, it was a busy court schedule. She had a lot of cases. The judge didn't think of that, and she just went ahead and appointed him as a matter of course, probably because he had been in the case for so long already. It was the quick decision, expeditious thing to do. She didn't have to appoint him, but once the judge appointed Granish, he's in the case and protected by the same rules, Davis and Jackson and the other rules. So throughout this case, the judge has said, since Mr. Granish is indigent, that trumps all the other decisions. That's simply wrong as a matter of law. The judge said there was no appropriate basis to appoint to counsel in this case. That's wrong as a matter of law. Capital Crimes Litigation Act and Rule 416d. To the extent that Rule 416d can be parsed, it says you should appoint two lawyers. You can appoint the public defenders. You can appoint two lawyers. The judge said, I didn't consider Rule 416d. I didn't think it applied. And the Capital Crimes Litigation Act also provided the judge could appoint an attorney or attorneys. So, you know, I'm sorry that this was a complicated situation that was made worse because that motion didn't get into the file and the judge didn't read it first. Mr. Granish did not deceive the court about two lawyers at all because the judge should have read the motion. Mr. Granish did not deceive the judge about going away because, in his expectation, the judge was supposed to appoint two lawyers and Mr. Tice would be working on the case, and if he went and came back, he would do that before there was ever any need for any next substantive court date. It was only because the judge appointed him and not Tice that he then said, well, you know, I really need Tice in this case. Would you please appoint Mr. Tice? It says so in my motion that we got off on this track. So I think the court, it can be said the court abused its discretion, and then by removing Mr. Granish, I'm arguing structural error. Davis and Jackson both support structural error. Everything after the removal of Mr. Granish has to be voided out. We have to go back to square one with Mr. Baez at a pretrial posture. Why is it structural error? Many of the reasons stated in Gonzalez-Lopez that discuss structural error apply to this case, but we don't know what Mr. Granish and Mr. Tice would have done. Lawyers are not fungible. Now, he may have gone to trial. We don't know. You know, the judge scoffed at our remark in the circuit court that he would have gone to trial, but you don't know. You can't predict that he would not have gone to trial. I have argued cases in this court in DuPage County where the lawyers did a bench trial and a jury sentencing. He might have done that. I know you would find it unpersuasive, but there are indications in the record that there were statements from the defendant that he was contemplating a guilty plea long before Granish's removal, right? I think he used the word deciding. The judge, when the judge removed Mr. Granish, Mr. Baez, about a page later, ups and says, I'd like to change my plea. I'd like to plea guilty in this case. I've been deciding this from the beginning. Well, deciding means considering, I think. And the judge said, I think you said that before. And he said no. And I say that's the best evidence that he did not say that before. The judge has in her mind that he said a lot of different things, which I don't think he ever said. But at that point, his decision to plea guilty was after Mr. Granish was removed. So, you know, it's chicken or egg. I'm saying that because Granish was removed, he is now frustrated with the fact that his motion for substitution of counsel was denied and now his counsel of choice was removed, and he wanted to, at that point, he announced that he wanted to change his plea and plea guilty. The structural error argument doesn't depend upon any of that. The structural error argument says once the court removed Granish without Mr. Baez's consent, that's it. That's the constitutional violation, and you don't need to go any further. You just need to void the death sentence, void the convictions, and send it back to a pretrial posture. But issue two in my supplemental brief deals with the fact that the guilty plea. And we argue that the decision to announce that he wanted to plea guilty was induced in part by this consideration, that he was losing Mr. Granish. He liked Mr. Granish. If he had been asked, he would have said, yeah, I want Granish enticed, yeah. So the removal of Granish at that point and the non-appointment of Tice puts Mr. Baez in a situation where he's now deciding that he wants to plea guilty, and he should have been allowed to withdraw his guilty plea. I cite the Morial case. Morial got time when his lawyer said you get probation. It's 4-12, Illinois. It's a 1952 case. But the court said one of the factors was Mr. Crane, the lead lawyer, was in trial over here in the courtroom over here. His young associate in the same firm pleaded the case, pleaded the client guilty. That was not good enough. That was a violation of the right to counsel of choice or the counsel of his choice is what this court said, and it's in the brief. And I think Morial is good authority for saying that it doesn't matter whether Mr. Baez had other lawyers subsequent to Mr. Granish. His decision to plea guilty was announced for the first time on the record, and it was after Mr. Granish was removed, and he was induced to do that. And Morial is good enough to say Mr. Granish wasn't present when he pleaded guilty, and therefore the plea must be allowed to be vacated. That's what happened in Morial. That's what should happen here. I see I'm almost out of time. Are there any more questions on anything in the case that I can answer? Thank you. Thank you, Your Honors. State. May it please this honorable court, my name is John Walters. I'm an assistant state's attorney, and I represent the people of the state of Illinois in the matter before you. In this case, Defendant Baez invited Juan Estrada over to his apartment. According to the video statement, it was because he wanted to engage in a drug transaction. Juan Estrada drove his companion, Janet Maino, over to this complex. Defendant and Juan Estrada went up to Defendant's apartment. And, again, according to Defendant, they began to discuss the terms of the drug transaction, but Mr. Estrada objected because Defendant already owed him a considerable sum of money, something like $1,000. During this conversation, this discussion, Mr. Estrada, again, according to Defendant, became a little animated. He was waving his arms, and he called Defendant a couple names. He wasn't armed. Defendant, in his own words, reacted in a truly hostile manner. He pulled a gun out of his waistband. He shot the victim twice, but that did not kill Mr. Estrada. So Defendant reached for, he had a display, a series of Japanese ceremonial, they weren't ceremonial, they were Japanese swords. He grabbed one of them, and he proceeded to slash and stab Mr. Estrada close to 40 times. There were 24 slice wounds in this case and 14 stab wounds on Mr. Estrada. During the course of this, during the course of this, this is really interesting, Mr. Estrada asked Defendant, why are you doing this to me? And Defendant gives Mr. Estrada a completely different motive than I was afraid of you, Mr. Estrada, or I was angry about the drug transaction. He says, oh, well, you're turning members of our organization against me. Now, there's a whole history of deception with this Defendant. He's been diagnosed with antisocial personality disorder, and that has something to do with some of the issues that were raised by Defendant. But in any event, what does Defendant do next? After he's slaughtered Mr. Estrada, he washes his hands, and he cleans himself up to look presentable. And then he goes down, downstairs, goes down to the parking lot to Ms. Mena, and he lures her upstairs. He says, Juan's going to be a while. Why don't you come on up and wait there with us? And he directs her to the bathroom. He offers to get her a drink of water. And when her back is turned to him, he proceeds to place her in a chokehold, takes her down to the ground, and tries to strangle her to death. But he's not successful. In the course of trying to strangle her to death, this is what Defendant's aware of. He's aware that Janet Mena is saying her final prayers. He's aware of that. But what does he do? Instead of breaking off, he then decides to stomp Ms. Mena in the back of her neck. He kicks and stomps her in the vertebrae. He's trying to break her neck. He doesn't feel that he's successful killing her that way. So he drags her into the bathroom. And, by the way, in his own words, he had cunning. The issues in this case, how do all of these facts relate? These facts relate. It is always an issue in this court, in a capital case, whether death is the appropriate sentence.  And the reason that I bring these facts to this court's attention is because it is always a factor. It is always a decision that this court must make. I'd like to move on to the issue that Defendants spent the most time on, which was the issue regarding Judge Lampkin's exercise of discretion in this case, which was completely proper. She was faced with a situation where the prosecution had filed their answer to discovery. The ball was in the defense court. And what was this defense attorney doing? He files a motion. In this motion, you will look in vain. You will look in vain for any word about Mr. Granich going on a vacation, leaving the country. It's not in there. He did mislead the court. The only word that he said on the subject on this particular court date, April 26, was, well, I'm going on vacation. That doesn't jive with his testimony at the remand hearing that this court ordered, because at that remand hearing, he conceded as much that this was not a little vacation. He conceded that he was thinking about living in Israel, that he did not supply the court with the requested notice when he would be coming back, that he had a conversation with Judge Lampkin in chambers. And this is really important, because Judge Lampkin puts this conversation that they had in chambers in the record for you. And she makes it part of her findings at the conclusion of the remand hearing. And these findings are absolutely essential to this case, because what we find out in that remand hearing is that Mr. Granich was at a crossroads in his life. He didn't even know whether he was going to be living in Israel or living in the United States. He had no idea when he was coming back or if he was coming back. That comes from Judge Lampkin's findings from this in-chambers discussion that Mr. Granich had on the second date. And I submit to you the reason that he finally had this discussion in chambers with Judge Lampkin and finally disclosed what he was doing in this case is because he had no plan B. He only had a plan A in this case. And that plan A was that he would be appointed along with Mr. Tice, and that he was going to transfer everything over to Mr. Tice, and he was leaving the country and he was going to leave it in Mr. Tice's hands. And why do I say that? You look at the record. Look at the actual statements of Granich in the record in this case. He doesn't say, oh, we're going to be sharing responsibility. That is not what he said. Maybe seven years later at the remand hearing he said something like that. But when push came to shove, when this case really mattered at the time that this decision was being made, here's what Mr. Granich said. I'm going on vacation and Mr. Tice is going to be taking over the litigation of this case. Those are his words in the record. And the next court date he was absolutely consistent with that. He said, Mr. Granich, I'm sorry, Mr. Tice is going to carry on this case while I'm gone. A public defender who was in the courtroom represented that he had had a conversation with Mr. Tice, I'm sorry, Mr. Granich, with Mr. Granich. And Mr. Granich told him it was going to be at least six months that he was going to be gone. This matters because, as I said, the people had filed their answer to discovery. The ball was in the defense court. And at the remand hearing Mr. Granich admitted the following. He admitted that this was a complex case, that it was going to involve interviewing hundreds of witnesses, potentially hundreds of witnesses, that there were thousands of pages of discovery to digest, that obviously there was mitigation evidence that had to be accumulated. There was possible forensic testing of the DNA evidence in this case. The defense might want to do independent testing of that. These are all concessions that Mr. Granich made about how he was going to have to handle this case. These were all things that were going to have to happen, but Mr. Granich was going to be out of the country. Counsel, at the time when Granich was requesting to be attorney, did the capital litigation rules apply? Partially. Partially they did. The parameters for the capital litigation trial bar were in place. The capital litigation act was effective. But in terms of the existence of an actual capital litigation trial bar, that wasn't in place yet because this court knew that it would take some time for attorneys to get their materials together, get those filed with the court. The court would have to approve those people who would go on to become members of the capital litigation trial bar. So at the time of this, did the rules apply is my question. Yes, they did. Yes, they did. And under the statute, both the Public Defender Act Section 133 of the Criminal Code and Section 124.5 of the Capital Litigation Act, they both specified who should be appointed for an indigent defendant. And they said, working together, those two statutes read together said that you would appoint the public defender or a member of the capital litigation trial bar. Well, there was no capital litigation trial bar at this point. So the judge, did she err because there was a misunderstanding of this? She did not err in this case. There are two grounds that are expressly applicable to this case that have been announced by the United States Supreme Court and actually affirmed by this court in Burnett. And one of those is that whether he's retained or not, a defendant is not entitled to an unavailable counsel. And that absolutely applies in this case. Mr. Granich was not available. So Judge Lampkin was applying good law. She was applying the precedent of the United States Supreme Court and this court in determining that Mr. Granich wasn't going to be available for defendant. And that's a perfectly acceptable rationale. Do you challenge that there was never an attorney-client relationship between the defendant and Mr. Granich? I don't. I'm not saying that there wasn't an attorney-client relationship. But that particular issue is a little bit complicated because of the posture of this case. But Judge Lampkin found that that complication was being done for a reason. Let me get into that a little bit. Yes, originally in this case, defendant wasn't represented even by Mr. Granich. He was originally represented by public defender. He was an indigent. And then Mr. Granich steps forward in this case at some point and is offered a retainer. And we know it isn't very much of a retainer because Mr. Granich says it's about $6,500. He said he'd worked a total of 20 hours on the case. In nine months, he'd only worked 20 hours on this death case. And when you look at all the things that he had to do in this case, that's a really minimal amount of time that he had put in in this case. But he'd already used half of the retainer up. And he testifies at the remand hearing that he's in this case for the money, and I don't blame him. But he's in this case to be paid. He's not going to work in this case pro bono. He needs to be paid. And my position, I submit that Judge Lampkin found that she knew all along that he accepted this money, this minimal retainer, in order to work an end around the statutes of the state, the rules promulgated by this court specifying that for an indigent defendant, the default rule is appointment of the public defender. It doesn't mean that you can't ever have private counsel, but it means the default rule is appointment of the public defender. And what this case actually represents is a recipe for getting around, doing an end around that default rule. Do you believe that Judge Lampkin ever appointed Mr. Granich as private counsel in this case, and then unappointed him, or did she not appoint him, or what? Tell me about what you think. Legally, legally she never appointed him. Although she said the words, I appoint you on the record, it's clear that this was a contingent appointment, that Mr. Granich was only offering his services so long as Mr. Tice could be appointed along with him. As I said before, he had no plan B. In order for his appointment to work, he had to have Mr. Tice on this case. So his offer to be appointed in this case was conditional, and that condition was never granted. What happened was the court probably as a matter of course saw this attorney step forward. He had been defendant's counsel. He was asking to be paid by the state. She probably thought, no problem. And then, and then Mr. Granich brought her attention to the fact that he needed, and if you look at the motion, it's very specific. Mr. Granich, although he didn't say anything about leaving the country, he did say this. He said it's necessary, it's necessary to appoint me and Mr. Tice. Did he ever use the words condition? Condition appointing both of us? He, he himself never used the word condition, but it's, it's. Did anyone use those words? A judge? A defense? I mean a state? I submit, Your Honor, that it's, it's, it's clear from the record that that's what this is. Because Mr. Granich is leaving the country, and who's going to represent defendant? Mr. Granich is only going to work on this case if he's going to get paid, and if, and if Mr. Tice is appointed as his substitute counsel, his placeholder counsel. It's, it's clear from the record. There's, there's no other way that this is going to work. He doesn't offer an alternative. He never offers an alternative. This is it. You take us, we're a team, you take us both, or he never, he never offers another alternative to Judge Lampkin in this case. Was the defendant entitled to get two, have two attorneys appointed? There seemed to be some confusion. The judge thought that they were not entitled, the defendant was not entitled to have two attorneys appointed. I, I think at that point in time she was confused about that issue. I think a reading. Was the defendant entitled to have two attorneys? I think a reading of Rule 416 of this court with, with respect to the capital litigation trial bar indicates that there should be two, two attorneys appointed, or two, there should be two attorneys at least on, on a capital case. There isn't any issue related to Tice's appointment though, right, before us? No. He, he really, he never made an appearance until I believe either the May 9th date or the May 22nd date when all this was resolved. And, and that's, that's another point. This issue of appointment was never, it was never final. It was never resolved because it was so dependent on Mr. Tice's appointment and Mr. Tice was never appointed. The court never resolved that issue until on May 22nd she did formally appoint the public defender and she, she in her words vacated whatever appointment she had made of, of Mr. Granich in the case. Keep in mind he's not retained counsel. He's not retained counsel in this point. He admits as much. He admits at the remand hearing I need to be paid. I'm not doing this pro bono. And defendant in this case has filed an affidavit of his assets and liabilities. He files that basically in conjunction with this motion to be appointed, Mr. Granich's motion to be appointed so he could get paid by, by the state. So Mr. Granich is, is no longer retained at this point. He is, he's clearly seeking to be appointed counsel. He is an indigent defendant. He can only represent this defendant if he's going to be paid. And he withdraws, he actually withdraws his appearance in the case. He says it's over his objection. Note the, the court didn't, didn't remove his appearance. She vacated the appointment that she had made that, that she thought she had made a month earlier. But she didn't vacate his appearance. He withdrew his appearance. He said it was over his objection, but he's the one that withdrew from this case. Nonetheless, at this point he was no longer retained. And as I said before, even if he were retained, it wouldn't matter. It wouldn't matter in this case because he wasn't available. And it doesn't, it does not have to be the situation that the case is on the eve of trial. Defendant makes that point in his reply brief. He says, well, the Spurlark case, and this court was aware of the Spurlark case when it decided Burnett, which I, which I mentioned earlier. He says the Spurlark case was a, well, that was an eve of trial decision. So that's different. But the, the other cases that I cited were not eve of trial decisions. The Huey case was, the attorney was removed in that case for failing to make a commitment to, to represent the defendant. The attorney was removed in that case some five months before trial. And in the Mungia case, which was also a capital case from California, the defendant in, I'm sorry, the attorney in that case, the appointed attorney in that case, was removed some nine months before trial in that case. So it is not, it is not the case that this has to be a, a eve of trial sort of decision. This court promulgated the capital litigation trial bar for a reason. And that, those rules are very much implicated by this case. This court well understood, I don't have to preach to this court, this court well understood why it promulgated the capital litigation trial bar. And I submit it's because, among other things, you wanted to ensure that the attorney representing the defendant in a capital case made a serious commitment, was qualified, and would make a serious commitment to represent somebody who was on trial for their life. And I submit to you that Mr. Granich's comment that he was going to have sort of one foot over there half the world away and another foot here is exactly wrong and is exactly the reason why he should have been removed in this case because he could not make the serious commitment that's required to, to represent somebody and these are the highest stakes in criminal litigation. This is as high as it gets. And he could not make that commitment. And he should not have represented the defendant under, under these circumstances. And far from, far from defendant being able to, to show any sort of abusive discretion in this case, I submit to you that Judge Lampkin acted absolutely properly in removing an attorney who could not make the commitment, the serious commitment involved in representing a defendant on trial for his life. With respect to the second issue, I just wish to say, as I said in my brief, that that issue is really, it's, the first issue is going to be dispositive of the second issue. Because the second issue is the, the guilty plea considerations. And that issue clearly hangs on the claim that there was a misapprehension of law. What's the supposed misapprehension of law? That Judge Lampkin didn't, wasn't authorized to remove counsel. We know that's absolutely false. United States versus, versus Gonzalez-Lopez, Burnett. These cases authorized Judge Lampkin to remove an attorney who was unavailable. And, by the way, who was seeking appointment. Because an indigent defendant has no right to choose counsel. Because there was no misapprehension of law, and there could not be any misapprehension of law in this case, defendant had no legal justification for withdrawing his guilty plea. And I go on in my brief to talk about all the things that defendant says, and he makes quite a record about, about how he, he was voluntarily pleading guilty. How he appreciated the representation that he was receiving. There's, there's no question that, that defendant wasn't two years later pleading guilty because of something that happened with respect to Mr. Granich. But that's really, ultimately it's beside the point. If you decide the first issue, then you've decided the second issue. One more thing about, about the first issue, and with the, with the appointment of counsel. And this is really crucial. I, I bring this up because of the, the financial pressures that this state's under. And this court, this court is undoubtedly aware of those situations. There is a policy that's stated in, in the law, not just, not just from the General Assembly across the street, but actually by this court, too, in its own rules. That the preferred counsel to be appointed in a case is the public defender. This, like I said before, doesn't mean that there can never be private attorneys on the case. But let's look, for example, at Rule 416, the committee comments. This court says in, in appointing counsel in a capital case, that we're going to look at actually a number of things. We're going to look at counsel's caseload. So this court is very well aware if counsel is overburdened, if counsel is unavailable to represent a defendant, then that's a factor in whether they should be appointed. Are you saying that we should kind of overlook constitutional protections because of budget crunch? No, not at all. But I think, because for the reasons I've already articulated, there, there is no constitutional violation in this case. But there is a question that's raised about whether there's a policy in this state. Because the defendant argues that Judge Lamkin is sort of arbitrary, and that she's using this as some, some sort of wrong rationale for, for her decision in this case. But it has to be, it has to be as a practical matter, a rationale, a consideration in this case, of how attorneys are going to be paid. And it has to be a consideration that this, this court itself has articulated that counsel, the preferred counsel is the public defender, if nothing else, for fiscal reasons. I mean, the court decided a case called People v. Kenyon that I cited in my brief. And this court was very well aware that in a case, in an appointed case, counsel, because of the fiscal drain on a county's finances, and I submit to you that there's no difference between a fiscal drain on a county, on a county's finances and the state's finances. But because of that, the, the, this court said that a court should seriously, should appoint the public defender whenever feasible. And this court in Rule 416 in the committee comments said, okay, here are, here are times when you can appoint private counsel in this case. When the public defender is unable to supply the capital litigation, somebody from the capital litigation trial bar. Then you can look to private counsel to come in and step in on the case. Or in a case where, say, the public defender only has one capital litigation trial bar qualified attorney, and the second attorney is, as you mentioned before, Justice Freeman, the second attorney needs to be appointed, and for whatever reason, the public defender and that private attorney can't work together. That might be a reason to actually appoint two private attorneys in that case. And this court goes on to say, or when the public defender is unavailable for some other reason. But this court is working exactly in conjunction with the state statutes in this case, because the state statutes spell out that the default rule is appointment of the public defender. No, I'm not, I'm not saying that, that this court should overlook the Constitution. But I'm saying that, number one, Justice Lampkin was absolutely authorized by the Constitution. Because what does it say in Gonzales-Lopez? In Gonzales-Lopez, the United States Supreme Court said specifically that the right to counsel of choice is limited. It's limited in, by several important, in several important respects. And among those is the right to effective assistance of counsel. The defendant has the right to effective assistance of counsel. And we see in the Wheat case, the United States Supreme Court case in Wheat, that when push comes to shove, and the question becomes whether we're going to have counsel of choice or counsel who is effective and can actually represent the defendant in this case, the court is going to choose for effective assistance of counsel. And we see the limitations that the United States Supreme Court expressly spelled out in United States v. Gonzales-Lopez. So Judge Lampkin was acting under color of this court's rules. She was acting under color of the state statutes. And she was acting under color of constitutional precedent as set out by this court and by the United States Supreme Court. Mr. Granich in this case, as I said before, he was not able to make the serious commitment required in this case. But there's something more to it than that. There was a decided lack of candor in what he said to the court. And I've talked already about the fact that his motion mentions nothing about him going on vacation. You'll look in vain. It's not there. And the fact that ‑‑ Let me just ask a question about Sixth Amendment and try to get it a little different way. That entitles him to counsel. But it also includes the right to refuse a licensed attorney. The defendant can refuse a license. You're speaking of Freda. And it seems that I think in this case at various times he indicated that he wanted to represent himself. If that is correct. There was one occasion, there was one court date where he made some mention that he wanted to represent himself. And on the very next court date, unprompted by the court, he said, and I agreed to have counsel represent me. I'll ask about the times when he said he wanted to represent himself. I think also the record would kind of indicate that his decision to plead guilty was made because he was told that he had to have the public defender once Granich was removed. If that is true, and under those circumstances, it would appear that his voluntary decision to plead guilty, since the Constitution doesn't compel him to take the public defender, may be a violation of the Sixth Amendment. How do you view that? It's not, Your Honor, because first of all, as I said before, he's not under a misapprehension of law here. Judge Lampkin was acting legally correct, as I mentioned before. There's no misapprehension of law. Therefore, there's no grounds for withdrawal of the guilty plea. And with respect to the Fredda situation, again, this was one occasion where the defendant actually stood up and said something about wanting to represent himself. Judge Lampkin very kindly said, would you do this for me? She didn't require it of the defendant, but she said in her words, would you do this for me? Would you talk this over with your attorney? He talks it over with his attorney, and at the very next court date, he says, I choose to have counsel represent me. And I think that answers your question pretty solidly, because at that point, the defendant says, I choose to have counsel, meaning the public defender who's representing him, represent me. And even at the time of the guilty plea, he says that he appreciates the job that the public defenders are doing, and he says, quote, unquote, they do pretty much everything I ask them to do. Are there any other questions from the court? I know my time's just about out. Thank you. People in the state of Illinois respectfully request that this court affirm defendant's conviction and sentence of death. Well, Justice Garment, to answer your question, this is what Judge, now Justice Lampkin, said at page 15. This is her 58 pages of findings recently. She said on April 26th, on that court date again, I had not read the motion for appointment of counsel, but certainly had discretion to appoint counsel. And I appointed Mr. Gramish on that date, on April 26th of 2001. That's page 15. Gramish was appointed on April 26th, and at some other place, which I haven't found that's in here, the judge said, there's no question but that he was appointed. That's not an issue. He was appointed. So the whole idea that there is a default rule in favor of public defender is based upon case law from a long time ago that predated the Capital Crimes Litigation Act. It is the policy of the General Assembly that capital cases should be assigned between private counsel and the public defender office equally. There's funding for one. There's funding for the other. There is no such thing as the default rule that we should appoint a public defender office in capital cases. And if we gave them 100% of the cases, or conversely gave 100% of the capital cases to private bar counsel, then the funding that was available would be exhausted, but the General Assembly wants it to be distributed among both types of counsel. There was no plan B. Well, what is he talking about? If the judges said, no, I'm not appointing Tice, you're in the case by yourself, plan B would have been to stay home and represent Mr. Baez, which is what he testified he was going to do. It is inconsistent to say that he wanted to dump the case on Tice but get the case for money. And the only way they can make that false construct work is to come up with this idea that his appointment was really a contingent request. It was not. There's nothing in there about, don't appoint me if you don't appoint Tice. The other thing that Judge Lamkin said was that, I'm slipping, my memory is slipping now, but she said over here on page 17 that he wanted to substitute Tice into the case, and she says that on 16 or 17, but then over on 24 she says, in effect. So, in effect, he wanted to substitute Tice in the case. I don't know which it is, but the fact of the matter is, he testified that he was going to represent the case, and he said if I would have stayed in the case had I been allowed to. There are other details here. Judge Lamkin did vacate his appearance as retained counsel, as well as vacating her appointment of him as appointed counsel. The bottom line is that this, is that Granich was hired to do a case. He knew there was a capital litigation fund that was coming. There was nothing wrong at the time he took the case with taking the case. He did a lot of work on the case, but the state had not announced it was a capital case. Given the retainer he had, he had to pick and choose what he was going to do first. He did what had to be done. He read all of the guilt, innocence, discovery. When the state announced it was going to be a capital case, then he had his motion ready to ask for funding. He needed funding. No question he needed funding. And he even said that back in January. But he had an established attorney-client relationship with Baez. He was removed from the case unnecessarily. It was unreasonable because a lot of time would have to go by before anything substantive was going to happen. And Mr. Baez did not consent to this. He was not even consulted about this. Isn't that a violation of the existing attorney-client relationship when the judge terminates it because the judge thinks that there has to be a reason for appointing somebody other than the public defender who she already appointed? Isn't it time to say that on April 26th? Instead of saying you're appointed, come back and give me the issue. She said, wait a minute, not so fast. I'm going to take back my appointment. That would have been okay on that same day, but she did it. She waited until later. And, unfortunately, that means that Mr. Granich is in the case and ripping him out of the case is a violation of the Sixth Amendment and Article I, Section 8, which is an independent and adequate state ground in this case. If I may have a minute. I think the findings that Judge Lampkin made in 2008 are not reliable in terms of Mr. Granich being at a crossroads of his life, Mr. Granich saying he was going to go and might not come back. It's inconsistent with what was said on the record at the time, and I agree we should focus on what was in the record at the time. It was not subject to cross-examination. Granich was called as the court's witness. The court didn't ask Granich to verify or dispute those memories that the judge had of what he was going to do. His testimony is consistent throughout that he was going to stay on the case and work on the case, and he would come back and work on the case. I don't think that it's fair for the judge not to have asked Mr. Granich those questions. He did say on the 9th that he was going out of the country. The judge said that three times. The whole problem here is the judge said, I think I should report the public defender when it was unnecessary and unreasonable to do so. And the statute 113-3B does have a preference for public defenders in non-capital cases, but 113-3F, as I say in the brief, is different. And that says in capital cases, 113-3B does not apply. Now, Rule 416, if I can have a minute. Rule 416 says the court should apply Rule 416 to the extent feasible. And Rule 416 says the procedures adopted herein shall be applicable, blah, blah, blah. Now, over on D, it says in all cases where the state has given notice of its intention to seek the death penalty, the trial judge shall appoint an indigent defendant to qualified counsel. Now, I stop right there. There's no period or comma or anything else there, because it goes on to say who have been certified as members of the capital litigation trial bar. But you can stop right there, you can read it right there, trial judge shall appoint an indigent defendant to qualified counsel, because the commentary says that the rule applies to the extent feasible. It says shall be effective immediately, and new rules in particular case pending at the time the rule becomes effective would not be feasible or would work in injustice. In other words, the trial court could have said, this is not feasible, I'm not going to apply it. Or not in justice. I see your time is running out. I just want to come back at a question I asked earlier from a little different angle. If indeed Mr. Grandich went to Israel and did not come back until the trial of this matter, which is at least arguably what the judge thought was going to happen in this case, wouldn't Mr. Baez have an issue then before this court that if the judge really believed that, that the judge would have abused the discretion for keeping Grandich in the case? Well, your question says what would happen if Mr. Grandich did something and then what the judge knew. Well, that's what the judge believed. If the judge believed because Mr. Grandich said he was going to be going and not coming back, that would be a concern, certainly. If Mr. Grandich said, I'm going to Israel and I'm not going to come back, then the judge would probably want to remove him from the case right then, right? Right. And that's why I said to you earlier at least the credibility determination that the judge focused on, namely that at one point it appeared he was only coming, I mean she believed he wasn't coming back until the trial. She didn't believe when he said, well, I really meant I was coming back for motions as well. So I guess the point is there's an issue if the judge keeps him in and there's an issue if the judge doesn't throw him out. He said he would come back to try the case when necessary, but that doesn't mean that the case was, I suppose you could say that he doesn't know when the case is going to be tried and he wasn't saying firmly that he wasn't going to be coming back for motions and no one asked him at the time and I think the solution to the problem is Burnett because Burnett says the judge should inquire further. The judge did try, she did say, I want to know in writing when you will be gone, but she could have inquired further and said, you know, does that mean you're not going to be coming back for two years? Does that mean you're going to be coming back to do motions? What does that mean exactly? And the judge only asked him, well, how long will you be gone? He said he didn't know. He said months. But I suppose the judge could have asked more pressing questions about details like that. To be fair to Mr. Granich, he was just trying to explain he was going on vacation and he would come back. I don't think he really meant to say with specificity that he was not going to come back for anything but the trial and that's how the judge was reading it. I don't know that's a fair reading. But counsel, you know, as a follow-up on that, the judge asked him to put it in writing and he never did. He didn't put it in writing and he said he didn't know why. He said the trip was very unplanned and spontaneous and I think he probably didn't know when. We can only speculate why he didn't do it, but the fact is the judge did go further and ask him to put it in writing. She asked him to put it in writing when he would be gone and he didn't do that. That's right. He should have done that, but he didn't. Thank you. I have a red light, so thank you very much. Marshall, case number 989.